**CONSOLIDATED EDISON, INC.,**
**Plaintiff/Counterclaim**
**Defendant**

v.

**NORTHEAST UTILITIES,**
**Defendant/Counterclaim**
**Plaintiff.**

**No. 01 CIV.1893(JGK).**

United States District Court,
S.D. New York.

March 21, 2003.

---

## AMENDED OPINION AND ORDER

KOELTL, District Judge.

This case arises out of the failed multibillion dollar merger between the plaintiff and counterclaim defendant Consolidated Edison, Inc. ("Con Edison") and the defendant—Northeast Utilities ("NU"). Pursuant to the Merger Agreement between the parties, Con Edison was to pay $3.6 billion for the outstanding shares of NU.[1] The merger did not proceed amid mutual recriminations. Central to this lawsuit are Con Edison's claims that NU fraudulently induced it to enter into the Merger Agreement and thereafter breached various provisions of that Agreement, particularly the representation that there had been no material adverse change to NU's condition or prospects. NU in turn charges that Con Edison failed to proceed with the merger as it was required to do under the terms of the Merger Agreement and thereby breached that Agreement. NU claims that Con Edison did not proceed with the merger, not because there had been any material adverse change, but rather because Con Edison believed that the price required by the Merger Agreement was no longer warranted and because NU refused to negotiate a substantially lower price than that set forth in the Merger Agreement.

In the Amended Complaint ("Complaint"), Con Edison sues NU on claims for breach of contract, failure of conditions precedent, fraudulent inducement, and negligent misrepresentation. NU has filed a counterclaim for breach of contract. Con Edison now moves for partial summary judgment pursuant to Fed.R.Civ.P. 56 on its First, Third, Fifth and Sixth claims for relief in the Complaint, as well as on NU's Counterclaim including certain affirmative defenses to the Counterclaim. NU has filed a motion for summary judgment on Con Edison's First, Second, Third, Fourth Sixth and Seventh claims for relief.

### I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). "The trial

---

1. For purposes of this motion, Con Edison will be referred to as the "plaintiff" and NU will be referred to as the "defendant."

court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo*, 22 F.3d at 1223.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

## II.

The following facts are undisputed or are matters of public record.

Con Edison, a New York corporation with its principal place of business in New York, New York, is one of the nation's largest investor-owned electric and gas utilities; it serves the greater New York metropolitan area. (Def.'s Rule 56.1 St. ¶ 1; Pl.'s Resp. Rule 56.1 St. ¶ 1; Compl. ¶ 10.) Con Edison has extensive knowledge and experience in the field of electric generation, transmission, and distribution. (Def.'s Rule 56.1 St. ¶ 2; Pl.'s Resp. Rule 56.1 St. ¶ 2.) Con Edison is also a sophisticated commercial entity with experience in merger and acquisition transactions, including the associated due diligence. (Def.'s Rule 56.1 St. ¶ 2; Pl.'s Resp. Rule 56.1 St. ¶ 2.)

Northeast Utilities is a holding company or business trust organized and existing under the laws of the Commonwealth of Massachusetts, with its principle place of business in Massachusetts. (Def.'s Rule 56.1 St. ¶ 3; Pl.'s Resp. Rule 56.1 St. ¶ 3; Agreement and Plan of Merger dated Oct. 13, 1999 as amended Nov. 1, 2000 ("Merger Agreement") § 3.01(a) attached as Ex. 1 to Declaration of Douglas M. Kraus Supp. NU Mot. Summ. J. dated May 8, 2002 ("Kraus Decl. Supp.").) NU owns three regulated electric utility subsidiaries, including Connecticut Light & Power Company ("CL & P"), as well as a regulated gas subsidiary. (Def.'s Rule 56.1 St. ¶ 4; Pl.'s Resp. Rule 56.1 St. ¶ 4.) NU also owns several unregulated businesses, including Select Energy, Inc. ("Select"), an energy marketing company that principally sells electricity to large energy users on a wholesale basis. (Def.'s Rule 56.1 St. ¶ 4; Pl.'s Resp. Rule 56.1 St. ¶ 4.) Two of Select's competitors, Con Ed Energy and Con Ed Solutions, are unregulated subsid-

iaries owned by Con Edison. (Def.'s Rule 56.1 St. ¶ 5; Pl.'s Resp. Rule 56.1 St. ¶ 5.)

In June 1999, Con Edison approached NU about acquiring the latter company and NU agreed to further discussions. (Def.'s Rule 56.1 St. ¶ 6; Pl's Resp. Rule 56.1 St. ¶ 6.) On July 29, 1999, Con Edison and NU executed a written Confidentiality Agreement. (Def.'s Rule 56.1 St. ¶ 7; Pl's Resp. Rule 56.1 St. ¶ 7; Confidentiality Agreement ("Confid.Agr.") attached as Ex. 3 to Declaration of John Gueli Supp. Con Edison Mot. Summ. J. dated May 10, 2002 ("Gueli Decl. Supp.").) The Confidentiality Agreement governed the due diligence period during which Con Edison could learn more about NU and further evaluate the potential merger.

NU contends that Con Edison conducted an "extensive due diligence investigation of NU's regulated and unregulated businesses" between July 29 and October 13, 1999. (Def.'s Rule 56.1 St. ¶ 9.) Con Edison allegedly organized its due diligence into two categories, or "tiers": Tier 1 consisted of information concerning NU's regulated utility businesses which were "value impacting" and thus of greatest importance to Con Edison. (Def.'s Rule 56.1 St. ¶ 10.) Tier 2 comprised information about other matters, including NU's unregulated businesses such as Select. (Def.'s Rule 56.1 St. ¶ 10.) Con Edison takes issue with NU's characterization of the Tier 2 information as non-value impacting. (Pl.'s Resp. Rule 56.1 St. ¶ 10.) Con Edison Chief Financial Officer Joan Freilich ("Freilich") testified in her deposition that, "[o]bviously subsidiary operations ... were value impacting, very high value impacting." (Deposition of Joan Freilich dated Dec. 18, 2001 ("Freilich Dep. Kraus") at 56 attached as Ex. 63 to Kraus Decl. Supp.)

The due diligence process involved a large number of Con Edison's officers and employees, as well as in-house and outside counsel, experts in due diligence investigations, and the investment banking firm Salomon Smith Barney ("SSB"). (Def.'s Rule 56.1 St. ¶ 11; Pl.'s Resp. Rule 56.1 St. ¶ 11.) Con Edison requested and received numerous documents from NU and conducted a series of meetings between representatives of both parties. (Def.'s Rule 56.1 St. ¶ 12.) NU claims that at no time during due diligence did NU refuse to provide Con Edison or its advisors with any information that Con Ed requested. (Def.'s Rule 56.1 St. ¶ 13.)

Con Edison presents a different version of due diligence. Con Edison claims that NU limited the documents provided to Con Edison because of confidentiality concerns about sharing competitively sensitive information. (Pl.'s Resp. Rule 56.1 St. ¶ 9.) Instead, Con Edison contends, NU insisted that Con Edison rely upon discussions and presentations by senior NU representatives in order to obtain requested information about Select. (Pl.'s Resp. Rule 56.1 St. ¶¶ 9, 12–13.)

Con Edison's claims in this case rely substantially on a four-year fixed price contract between Select and CL & P, known as the CL & P Standard Offer Contract ("CL & P Contract" or "Standard Offer Contract"), pursuant to which Select was obligated to supply electricity to CL & P for half of the total electricity needed for CL & P's retail customers for four years at a fixed price. The parties do not dispute that Con Edison knew that Select intended to enter into the four-year supply commitment months before signing the Merger Agreement in October 1999. (Def.'s Rule 56.1 St. ¶ 14, 62; Pl.'s Resp. Rule 56.1 St. ¶ 14, 62.) Both parties also agree that Select's prior experience in managing large standard offer contracts was extremely limited and was characterized by Joan Freilich as "quite negative."

(Def.'s Rule 56.1 St. ¶¶ 71–73; Pl.'s Resp. Rule 56.1 St. ¶¶ 71–73; Deposition of Joan Freilich dated Dec. 10, 2001 ("Freilich Dep. Gueli") at 40 attached as Ex. 71 to Declaration of John Gueli Opp. NU Mot. Summ. J. ("Gueli Decl. Opp.") sworn June 7, 2002.)

Under a fixed price contract, the buyer (CL & P) agrees to pay the seller (Select) a predetermined fixed amount for electricity to be supplied at a future date. Thus, in order to make a profit, Select had to secure supply below the price that it negotiated with CL & P. The seller is at risk of significant financial losses if the market price of energy increases to such a level that the contractual commitment can no longer be met profitably.

According to Con Edison, the parties discussed Select's risk management policies and expected profit margins during meetings on August 26–27, 1999 in Hartford, Connecticut, including the risk policies as they applied to the CL & P Standard Offer Contract. (Deposition of Luther Tai dated Nov. 20, 2001 ("Tai Dep. Nov. 20") at 31, 35–38, 40–41, 65–66 attached as Ex. 93 to Gueli Decl. Opp.; Tai Notes and Observations of August 26–27 Meeting dated Aug. 28, 1999 attached as Ex. 10 to Gueli Decl. Opp.; Deposition of Charles Weliky dated Nov. 2, 2001 ("Weliky Dep.") at 41, 45–48, 248, 254–55 attached as Ex. 97 to Gueli Decl. Opp.) A subsequent meeting took place on September 23, 1999 among Gary Simon ("Simon"), NU Senior Vice President of Enterprise Development and Analysis, Charles Weliky ("Weliky"), President of Con Ed Energy and Con Ed Development, and Timothy Frost ("Frost"), a Director in Con Edison's Corporate Planning Department. (Pl.'s Rule 56.1 St. ¶ 2; Def.'s Resp. Rule 56.1 St. ¶ 2) The parties disagree about the degree to which Simon, Weliky, and Frost discussed NU's risk management policies, particularly with respect to Select. (Pl.'s Rule 56.1 St. ¶¶ 2–3; Def.'s Resp. Rule 56.1 St. ¶¶ 2–3.)

Con Edison claims that over the course of due diligence NU represented that it had covered the CL & P Contract, specifically that Select had purchased enough energy to meet its obligations over the four years of the contract. (Pl.'s Resp. Rule 56.1 St. ¶¶ 62, 70). In fact, when NU signed the CL & P Contract on November 2, 1999, after Con Edison and NU signed the Merger Agreement, Select had acquired sufficient electricity to cover only its obligations during the first two years of the contract (2001–2002). (Def.'s Rule 56.1 St. ¶¶ 68–69; Pl.'s Resp. Rule 56.1 St. ¶¶ 68–69.) Select was thus "uncovered" for 2002–2003. (Def.'s Rule 56.1 St. ¶ 69; Pl.'s Resp. Rule 56.1 St. ¶ 69.) Select maintained the open position believing that it could acquire the necessary electricity to supply the latter half of the contract at a lower price because a large number of new power plants were set to open in New England which would drive down prices. (Def.'s Rule 56.1 St. ¶ 70.)

Con Edison contends that at the September 23, 1999 meeting between Simon, Weliky, and Frost, NU's Simon represented that "Select had supplied to cover the standard offer contract for Connecticut Light and Power ... that locked down the profit margins for that part of the business." (Deposition of Timothy Frost dated Oct. 15, 2001 ("Frost Dep.") at 109 attached as Ex. 61 to Gueli Decl. Supp.) Simon denies saying that the Standard Offer Contract was fully covered and claims that, to the contrary, it was clear to him "from [the] conversation on September 23, 1999 that Messrs. Weliky and Frost understood very well that Select had not secured sufficient power for the last two years of the CL & P Standard Offer

Contract." (Declaration of Gary Simon sworn June 6, 2002 ("Simon Decl.") ¶¶ 10–11.) Moreover, Simon directed the Con Edison representatives to John Forsgren ("Forsgren"), NU's Chief Financial Officer and Chairman of Select's Risk Oversight Council ("ROC") for any further questions about risk management. (Simon Decl. ¶ 6.)

The parties disagree about whether Con Edison pursued further information on Select and its risk management strategies, as well as whether NU provided such information in a forthright and complete manner. Con Edison claims that employees with relevant expertise reviewed the risk management policies and discussed Select's risk management policies with senior NU management, including Simon and Forsgren. (Pl.'s Resp. Rule 56.1 St. ¶¶ 81–83.) The parties do agree that prior to signing the Merger Agreement, Con Edison requested a copy of Select's risk management policies in response to which NU provided a copy of such a policy dated August 5, 1999 ("August Policies"). (Pl.'s Rule 56.1 St. ¶¶ 5–6; Def.'s Resp. Rule 56.1 St. ¶¶ 5–6; August Policies attached as Ex. 4 to Gueli Decl. Supp.) It is clear that Mr. Weliky only reviewed the August Policies after the September 23, 1999 meeting with Mr. Simon. (Weliky Dep. at 72, 267.)

Con Edison contends that the August Policies were already "the subject of review" and "in the process of undergoing major revision" although no such changes were disclosed to Con Edison. (Pl.'s Rule 56.1 St. ¶ 11.) For example, Con Edison argues, NU and Select senior management considered the volumetric limits in the August Polies "unrealistic," "obsolete," "too constraining," "not feasible," and lacking "good business sense." (Pl.'s Rule 56.1 St. ¶ 12.)

NU, however, asserts that NU constantly reviews, evaluates and upgrades Select's risk management policies and that in September 1999, when the August Policies were turned over, Select was merely contemplating making appropriate revisions to meet the growth in Select's portfolio. (Def.'s Resp. Rule 56.1 St. ¶ 11; Forsgren Dep. at 168.) NU also claims that Con Edison never inquired into whether Select was or would be making changes to its risk management policies despite the fact that Con Edison should have been aware of the possibility because NU informed Con Edison that it was going to be Select's business practice to hold substantial open positions in order to build its business, thereby requiring at minimum an exception to the August Policies. (Def.'s Resp. Rule 56.1 St. ¶ 12.) John Forsgren, the person with primary responsibility for risk management at Select and to whom Simon had referred Weliky and Frost for additional questions, stated under oath that "[a]t no time during the due diligence period did anyone at Con Ed ask me any questions regarding Select's risk management policies." (Declaration of John H. Forsgren sworn May 1, 2002 ("Forsgren Decl.") ¶¶ 13, 14.)

NU also contends that during due diligence, Con Edison never discussed the August Policies or any aspect of risk management with any officer or employee of Select. (Def.'s Rule 56.1 St. ¶ 83.) Nor did Con Edison request or review any of the written reports that Select prepared about its open, uncovered positions on its supply contracts or any of the minutes or reports of Select's ROC. (Def.'s Rule 56.1 St. ¶ 83.) Moreover, documents existed from which Con Edison could have verified whether Select's expected supply obligations under the Standard Offer Contract were fully matched, or "covered." (Def.'s Rule 56.1 St. ¶¶ 75–77.) NU claims that Con Edison in fact ignored the advice of

one of its own employees to review the way in which Select implemented its policies in practice, because they appeared appropriate on paper. (Def.'s Rule 56.1 St. ¶¶ 81–82.) Nor did Con Edison attempt to place any restrictions in the Merger Agreement on NU's right to grant exceptions to or otherwise modify the August Policies. (Def.'s Rule 56.1 St. ¶ 82.)

The parties entered into an Agreement and Plan of Merger (the "Merger Agreement") on October 13, 1999. The terms of the document were negotiated by officers and employees from both parties as well as their respective legal and financial advisors. (Def.'s Rule 56.1 St. ¶ 15; Pl.'s Resp. Rule 56.1 St. ¶ 15.) On or about February 29, 2000 Con Edison and NU issued a Joint Merger Proxy Statement ("Joint Proxy") through which they sought shareholder approval of the merger. (Def.'s Rule 56.1 St. ¶ 16; Pl.'s Resp. Rule 56.1 St. ¶ 16; Joint Proxy attached as Ex. 2 to Kraus. Decl. Supp.)

The merger price to be paid by Con Edison, half in cash and half in Con Edison stock, was expected to be $26.50 per share of NU common stock assuming that the merger closed on December 31, 2000, by which time the parties anticipated receipt of the remaining regulatory approvals. (Def.'s Rule 56.1 St. ¶ 17; Pl.'s Resp. Rule 56.1 St. ¶ 17.; Joint Proxy at 6.) The merger price comprised three parts: 1) a $25 base price; 2) an additional $1 to be paid if, as expected (and as actually occurred), NU entered into a binding agreement to sell its Millstone nuclear power station to an unaffiliated third party; and 3) an "adjustment" payment of $0.0034 per day (or about $.10 per month) for each day from August 5, 2000 until the merger closed. (Def.'s Rule 56.1 St. ¶ 18; Pl.'s Resp. Rule 56.1 St. ¶ 18; Merger Agr. §§ 2.01(b)(ii)(A), 2.05.)

The $26.50 anticipated merger price represented a premium of more than 40 percent over the "unaffected" $18.56 price at which NU's shares were trading prior to the time that rumors of the transaction began circulating in the marketplace. (Def.'s Rule 56.1 St. ¶ 19; Pl.'s Resp. Rule 56.1 St. ¶ 19.) The premium constituted more than $1 billion of the total $3.6 billion that Con Edison expected to pay for NU's 137 million then outstanding shares. (Def.'s Rule 56.1 St. ¶ 20; Pl.'s Resp. Rule 56.1 St. ¶ 20.) By the time Con Edison cancelled the merger on March 5, 2001, the $0.0034 per NU share, per day, adjustment payment rendered the merger price over $26.70 per share, and the premium had grown to over $1.1 billion. (Def.'s Rule 56.1 St. ¶ 21; Pl.'s Resp. Rule 56.1 St. ¶ 21.)

The parties dispute the reasons why Con Edison agreed to pay this premium and the degree to which Con Edison sought to downplay the price of the transaction when making the merger public. (Def.'s Rule 56.1 St. ¶¶ 22–23; Pl.'s Resp. Rule 56.1 St. ¶¶ 22–23.) As evidence of Con Edison's desire to make the price of the merger appear low, NU cites an e-mail from Freilich to a group of Con Edison employees in which she wrote, "[NU] can be expected to want [various factors] expressed in a way that makes the price sound higher—and we will want it to sound lower. . . . I know you all know how to lie in front of a truck . . . this is one on which we may have to go through this exercise. Just remember who is buying whom. . . ." (E-mail from Joan S. Freilich dated Oct. 12, 1999 attached as Ex. 46 to Kraus Decl. Supp.)

NU claims that Con Edison was willing to pay the substantial premium because the companies' similar businesses and adjacent service areas promised a smooth integration of their respective operations.

(Def.'s Rule 56.1 St. ¶ 23.) Thus, NU and Con Edison made a good "fit". (Def.'s Rule 56.1 St. ¶ 23; Pl.'s Resp. Rule 56.1 St. ¶ 23.) Moreover, NU claims, because Con Edison viewed NU as an attractive acquisition target, offering a full price at the outset could preempt competing bidders. (Def.'s Rule 56.1 St. ¶ 24; Pl.'s Resp. Rule 56.1 St. ¶ 24.)

Con Edison contends that it offered only what it thought NU was worth in combination with Con Edison. (Def.'s Rule 56.1 St. ¶ 24.) Con Edison also disputes NU's characterization of the premium as "substantial", and notes that it perceived the parties to be a good match in the fall of 1999 because synergies would be readily achievable and because Con Edison believed that NU had a similar risk tolerance to Con Edison. (Pl.'s Resp. Rule 56.1 St. ¶ 23.) Both parties agree that no other bidders emerged after Con Edison and NU announced their proposed merger. (Def.'s Rule 56.1 St. ¶ 25; Pl.'s Resp. Rule 56.1 St. ¶ 25.)

During the due diligence, the parties jointly retained the accounting firm of Deloitte & Touche LLP ("Deloitte & Touche") to estimate the amount of savings, or "synergies", that might be achieved by combining Con Edison and NU. (Def.'s Rule 56.1 St. ¶ 28; Pl.'s Resp. Rule 56.1 St. ¶ 28.) Deloitte & Touche projected that if the companies combined they could save $1.3 billion and $180 million in their regulated and unregulated businesses respectively over a 10–year period. (Def.'s Rule 56.1 St. ¶¶ 29–30; Pl.'s Resp. Rule 56.1 St. ¶¶ 29–30.) After the parties signed the Merger Agreement, a joint transition team comprising personnel from both companies revised the estimated savings for the merged regulated businesses to $1.574 billion over ten years. (Def.'s Rule 56.1 St. ¶ 31; Pl.'s Resp. Rule 56.1 St. ¶ 31.) Con Edison Expert Ken-

neth Lehn estimates that the present value (as of April 13, 2001) of the combined regulated and unregulated synergies is $707 million. (Def.'s Rule 56.1 St. ¶ 33; Pl's Resp. Rule 56.1 St. ¶ 33; Expert Report and Disclosures of Kenneth M. Lehn ("Lehn Report") ¶ 37 n.14 attached as Ex. 61 to Gueli Decl. Opp.) The parties disagree as to the percentage of synergies that they would actually retain. (Def.'s Rule 56.1 St. ¶¶ 34–35; Pl.'s Resp. Rule 56.1 St. ¶¶ 34–35.)

The Merger Agreement itself contains a series of representations and warranties by NU, (Merger Agr. § 3.01), as well as numerous covenants circumscribing NU's conduct between the execution of the Merger Agreement and closing. (Merger Agr. § 4.01.) Included in the Merger Agreement is NU's commitment that "[e]xcept as otherwise expressly contemplated by this Agreement or as consented to in writing by [Con Edison], during the period from the date of this Agreement to the [time of closing], NU shall, and shall cause the NU Subsidiaries to, carry on their respective businesses in the ordinary course consistent with past practice. . . ." (Merger Agr. § 4.01.) The Merger Agreement's representations, warranties, and covenants do not mention Select's risk management policies that Con Edison claims NU misrepresented during due diligence. (Def.'s Rule 56.1 St. ¶ 27; Pl.'s Resp. Rule 56.1 St. ¶ 27.)

Con Edison argues that on May 4, 2000, Select adopted new risk management policies ("May Policies"), which Select's President, William V. Schivley, described as "substantially modif[ying] the requirements that we had in the previous policies and procedures." (Deposition of William V. Schivley dated Nov. 1, 2001 ("Schivley Dep.") at 159 attached as Ex. 80 to Gueli Decl. Supp.) Con Edison claims that NU never told Con Edison about the new poli-

cies until December 2000. (Pl.'s Rule 56.1 St. ¶ 19.) The May Policies no longer required a hedge ratio, no longer set a one million megawatt limit on fixed price energy commitments, and no longer required that Value at Risk ("VaR") not exceed $20 million. (Schivley Dep. at 159–61; Pl.'s Rule 56.1 St. ¶¶ 17–18.) Con Edison argues that if the merger had actually been consummated, Con Edison's own risk management policies would have required Con Edison to close Select's open position at a cost of $400 million, a fact and figure that NU contests. (Pl.'s Rule 56.1 St. ¶ 22; Def.'s Resp. Rule 56.1 St. ¶ 22.)

NU objects to characterizing the May Policies as "new", and instead describes the May Policies as revising the August Policies and deems the changes "replacements" rather than wholesale eliminations of portions of the August Policies. (Def.'s Resp. Rule 56.1 St. ¶¶ 14, 17–18.) NU also argues that Simon, Frost, and Weliky discussed the fact that Select was short on the CL & P Contract and that it "should have been obvious to anyone who [subsequently] read the policies that, at a minimum, an exception would be required for the Standard Offer Contract [with CL & P] and that other revisions would be required to accommodate the growth and changing nature of Select's business." (Def.'s Resp. Rule 56.1 St. ¶ 19.)

The parties dispute the degree to which rumors and the announcement of the proposed merger caused a subsequent decline in Con Edison's stock price. (Def.'s Rule 56.1 St. ¶¶ 36–38; Pl.'s Resp. Rule 56.1 St. ¶¶ 36–38.) However, in January 2000, Salomon Smith Barney, Con Edison's financial advisor, recommended to Con Edison potential modifications to the Merger Agreement. (Def.'s Rule 56.1 St. ¶¶ 39–40; Pl.'s Resp. Rule 56.1 St. ¶¶ 39–40.) The parties disagree about whether Con Edison sought out that advice or whether it came unsolicited. (Def.'s Rule 56.1 St. ¶ 39; Pl.'s Resp. Rule 56.1 St. ¶¶ 39–40.)

The parties filed a Joint Application for Approval of Change of Control by Connecticut Department of Public Utility Control with the Connecticut Department of Public Utility ("DPUC") on or about January 20, 2000. (Def.'s Rule 56.1 St. ¶ 41; Pl's Resp. Rule 56.1 St. ¶ 41.) The DPUC issued a Draft Decision approving the proposed merger on or about September 22, 2000, and issued a final approval approximately one month later. (Def.'s Rule 56.1 St. ¶¶ 42–43; Pl's Resp. Rule 56.1 St. ¶¶ 42–43.) In mid-February 2001, the United States Department of Justice granted the last of the principal regulatory approvals required to consummate the merger. (Def.'s Rule 56.1 St. ¶ 44; Pl.'s Resp. Rule 56.1 St. ¶ 44.) Both parties expected the Securities and Exchange Commission ("SEC") to approve the merger as required by the Public Utility Holding Company Act of 1935. (Def.'s Rule 56.1 St. ¶ 44; Pl.'s Resp. Rule 56.1 St. ¶ 44.)

On February 16, 2001, Con Edison's Chairman and Chief Executive Officer ("CEO") Eugene McGrath ("McGrath") advised Michael Morris ("Morris"), Chairman and CEO of NU, that Con Edison would not proceed with the merger on the terms set forth in the Merger Agreement and would only go forward at a substantial, unquantified discount to the previously agreed upon price. (Def.'s Rule 56.1 St. ¶ 47; Pl.'s Resp. Rule 56.1 St. ¶ 47.) During the meeting and subsequently, Con Edison identified several "material adverse changes" ("MACs") under the Merger Agreement that allegedly warranted the discount. (Def.'s Rule 56.1 St. ¶ 48; Pl.'s Resp. Rule 56.1 St. ¶ 48.) NU disputed Con Edison's entitlement to renegotiate the merger price. (Def.'s Rule 56.1 St. ¶ 49; Pl.'s Resp. Rule 56.1 St. ¶ 49). NU

contends that by mid-February of 2001, worsening market conditions meant that there was virtually no chance that a competing bidder would emerge who would pay close to the price agreed to by Con Edison. (Def.'s Rule 56.1 St. ¶¶ 45–46.) Moreover, NU claimed that it was a stronger company in 2001 than it was in October 1999 when the parties executed the Merger Agreement. (Def.'s Rule 56.1 St. ¶ 49.) Con Edison disputes this assertion. (Pl.'s Resp. Rule 56.1 St. ¶ 49.)

On February 27, 2001, one of NU's financial advisors, Morgan Stanley Dean Witter ("Morgan Stanley") made a presentation to NU's Board of Trustees. (Pl's Rule 56.1 St. ¶ 23; Def.'s Resp. Rule 56.1 St. ¶ 23; Morgan Stanley February 27, 2001 Presentation to NU ("MS Feb. Presentation") attached as Ex. 39 to Gueli Decl. Supp.) Con Edison claims that Morgan Stanley's presentation showed that NU's current forecasted earnings for 2001–2005 had fallen to $1.094 billion from a total of $1.458 billion in earnings forecasted in October 1999 for that same period. (Pl.'s Rule 56.1 St. ¶ 24.) Morgan Stanley also presented a discounted cash flow analysis that Con Edison claims showed a drop in NU's value between October 1999 and February 2001 from a range of $18.25–$23.50 per share to $15.25–$18.50. (Morgan Stanley Presentation to NU Board of Trustees dated Oct. 11, 1999 ("MS Oct. Presentation") at 33 attached as Ex. 12 to Gueli Decl. Supp.; MS Feb. Presentation at 4.) NU argues that the earnings forecasts cannot be compared as Con Edison has done because of differences in the ways that the figures were calculated. (Def.'s Resp. Rule 56.1 St. ¶¶ 24–25.) NU also contends that Morgan Stanley's discounted cash flow analysis was based on an inaccurate and unrealistic projection of NU's future earnings. (Def.'s Resp. Rule 56.1 St. ¶ 25.)

On February 28, 2001, NU made a formal written demand on Con Edison to provide reasonable assurances that Con Edison would comply with its contractual obligations and consummate the merger in accordance with the terms of the Merger Agreement. (Def.'s Rule 56.1 St. ¶ 51; Pl.'s Resp. Rule 56.1 St. ¶ 51.) Con Edison responded by letter dated March 2, 2001 that, "Con Edison fully intends to abide by its obligations under the Merger Agreement and believes that it is and at all times has been in compliance with the terms of the Merger Agreement. Con Edison therefore is ready, willing, and able to close the transaction provided Northeast Utilities is able to satisfy all of the conditions precedent to closing." (Letter from Eugene McGrath to Michael Morris dated Mar. 2, 2001 attached as Ex. 51 to Gueli Decl. Opp.) Mr. McGrath of Con Edison subsequently advised Mr. Morris of NU on March 5, 2001 that Con Edison would not proceed on the terms set forth in the Merger Agreement, and that it would not pay NU more than $22.50 per share. (Def.'s Rule 56.1 St. ¶ 52; Pl.'s Resp. Rule 56.1 St. ¶ 52.) Con Edison contends that it could not agree to the previously offered price because NU had suffered a MAC that dramatically lowered NU's valuation. (Pl.'s Resp. Rule 56.1 St. ¶ 52.)

NU's Board of Trustees considered the $22.50 offer and unanimously rejected it, concluding, based on the advice of their financial and legal advisors, that Con Edison had no grounds to renegotiate the merger terms. (Def.'s Rule 56.1 St. ¶ 53; Pl.'s Resp. Rule 56.1 St. ¶ 53.) NU announced thereafter that Con Edison had rejected its request for reasonable assurances and that NU was treating this rejection as an anticipatory repudiation of the Merger Agreement. (Def.'s Rule 56.1 St. ¶ 54; Pl.'s Resp. Rule 56.1 St. ¶ 54.) NU declared that it would take appropriate

action to recover the benefits of the merger for its shareholders. (Def.'s Rule 56.1 St. ¶ 54; Pl.'s Resp. Rule 56.1 St. ¶ 54.)

Con Edison filed its original Complaint in this action on March 6, 2001 seeking a declaratory judgment that NU had breached the Merger Agreement and that, consequently, Con Edison was excused from performing its obligations thereunder. NU filed a separate action in this Court on March 12, 2001 asserting a claim for breach of the parties' Merger Agreement but later withdrew the action and asserted the claim as a counterclaim in this litigation.

Con Edison subsequently filed its Amended Complaint (the "Complaint") that asserts the following seven claims for relief: First, breach of contract based on NU's alleged breach of the covenants in Section 4.01 of the Merger Agreement; Second, breach of contract based on NU's alleged breach of the representation in Section 3.01(i) concerning the absence of certain material adverse changes or events; Third, failure of condition precedent under Section 6.02(b) of the Merger Agreement that NU had performed in all material respects all its obligations required to be performed under the Merger Agreement, specifically NU's obligations under Section 4.01 of the Merger Agreement; Fourth, alleged failure of condition precedent under Section 6.02(a) of the Merger Agreement that NU's representations and warranties were correct when made and as of the closing date; Fifth, alleged failure of condition precedent under Section 6.02(d) of the Merger Agreement based on NU's having suffered a "Material Adverse Change"; Sixth, fraudulent inducement; and Seventh, negligent misrepresentation. NU's Counterclaim charges Con Edison with breach of contract because Con Edison allegedly repudiated its obligation under the Merger Agreement by refusing to proceed with the merger as it was required to do.

This Court has jurisdiction based on the complete diversity of citizenship of the parties. *See* 28 U.S.C. § 1332(a).

The Merger Agreement is governed by New York law, (Merger Agr. § 8.07), and the parties agree that New York law governs all claims in this action.

Both parties have now moved for summary judgment on various claims.

### III.

 NU moves for summary judgment dismissing Con Edison's claim for fraudulent inducement, the Sixth Claim for Relief. To state a claim for fraud under New York law, Con Edison must demonstrate (i) a representation of material fact; (ii) falsity; (iii) scienter; (iv) reasonable reliance; and (v) injury. *See Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A.*, 247 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citing *Manning v. Utilities Mut. Ins. Co., Inc.*, 254 F.3d 387, 400 (2d Cir.2001)); *see also Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir.1986). To plead fraudulent inducement, Con Edison must allege that it reasonably relied on false representations made by NU. *See Wells Fargo*, 247 F.Supp.2d at 363 (collecting cases). Con Edison must prove each of the elements by clear and convincing evidence. *Syntex*, 786 F.2d at 76.

The Complaint alleges that:

NU represented to Con Edison that Select's fixed-price contractual supply obligations to CL & P were or would be sufficiently matched, or that other appropriate risk management techniques would be employed, so that Select could realize specified margins on

the CL & P Standard Offer. Further, NU represented to Con Edison that Select adhered to defined risk management policies that precluded Select from maintaining more than a specified limited number of megawatt hours in unmatched fixed-price contractual supply commitments in any given year.... (Compl.¶ 78.) Con Edison claims that these representations were false. (Compl.¶ 78.) The alleged representations were purported to have been made orally by NU personnel during due diligence and not as part of the representations and warranties contained in the Merger Agreement.

■ NU contends that Con Edison cannot prove the element of reasonable reliance and thus cannot establish a valid claim for fraudulent inducement. NU denies making such representations, but that disputed issue of fact could not be a basis for summary judgment. Rather, NU claims that it is entitled to summary judgment because reasonable reliance on the extra-contractual representations in this case is foreclosed as a matter of law. NU bases this claim on the provisions of the Confidentiality Agreement and the Merger Agreement, and on allegedly well settled law.

First, NU argues, the Confidentiality Agreement's express disclaimer of reliance on any representations made during due diligence bars Con Edison's claim that it can and did rely on the alleged representations about Select's risk management policies. The Confidentiality Agreement's integration clause reads, "Only those representations and warranties made in a Definitive Agreement and subject to such

limitations and restrictions as may be specified therein will have any legal effect." (Confid.Agr.¶ 6.) The Confidentiality Agreement also provides, in part:

> The Parties (i) acknowledge that *neither Party nor any Representative of either Party makes any representation or warranty, either express or implied, as to the accuracy or completeness of any Evaluation Material,* and (ii) agree, to the fullest extent permitted by law, except as may be provided in a Definitive Agreement ... that neither Party nor any Representative of either Party shall have any liability to the other Party or any of the other Party's Representatives on any basis ... as a result of the Parties' participation in evaluating a possible Transaction, the review by either Party of the other Party or the use of the Evaluation Material by either Party or its Representatives in accordance with the provisions of this Agreement. *Each Party agrees that it is not entitled to rely on the accuracy or completeness of the Evaluation Material....*

(Confid.Agr. ¶ 6 (emphases added).) [2] NU claims that the terms of the Confidentiality Agreement thus expressly bar Con Edison from relying on exactly the type of representations they allege. Therefore, Con Edison cannot support a claim of reasonable reliance. *See, e.g., Banner Indus., Inc. v. Schwartz,* 204 A.D.2d 190, 612 N.Y.S.2d 861 (1994) (upholding dismissal of causes of action for fraud because disclaimers in confidentiality agreement barred the relevant reliance on oral misrepresentations).

---

**2.** The Confidentiality Agreement defined the term "Evaluation Material" as "as all data, reports, interpretations, forecasts and records (whether oral or in written form, electronically stored or otherwise) containing or otherwise reflecting information" concerning one party and supplied by that party to the other. (Confid.Agr.¶ 1.) A "Definitive Agreement" provides for a transaction and has been executed and delivered. (Confid.Agr. ¶ 6.)

Second, NU represents that the Merger Agreement's integration clause, combined with the document's representations, warranties, and covenants, bars reliance on any representations not explicitly set forth in the Merger Agreement. The Merger Agreement's integration clause provides that the "Agreement ... and the Confidentiality Agreement ... (i) constitutes [sic] the entire agreement, and supersedes [sic] all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter of this Agreement...." (Merger Agr. § 8.06.) The Merger Agreement contains no representations or warranties about Select's risk policies. Thus, NU contends, Con Edison cannot successfully assert its claim for fraudulent inducement.

■ Third, NU argues, Con Edison's purported reliance on any representations outside of the Merger Agreement is unreasonable as a matter of law. *See Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.*, 165 F.Supp.2d 615 (S.D.N.Y.2001) (hereinafter *Emergent Capital I* ) (finding that the plaintiff could not reasonably rely on statements not incorporated into a fully integrated, unambiguous stock purchase agreement); *see also Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.*, 195 F.Supp.2d 551, 562 (S.D.N.Y.2002) (hereinafter *Emergent Capital II* )[3] ("when the contract states that the defendant makes no representations other than those contained in another more exhaustive clause of the contract, a fraud claim may be precluded"). "Under New York law, where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by

the very representation it has disclaimed reliance upon." *Emergent Capital II*, 195 F.Supp.2d at 561 (internal citations and quotation marks omitted) (collecting cases).

■ Con Edison replies that the integration clauses in Section 8.06 of the Merger Agreement and Paragraph 6 of the Confidentiality Agreement use general language and thus do not bar its claim of reasonable reliance. Con Edison is correct that under New York law, a general merger clause does not preclude a claim for fraudulent inducement. *See, e.g., Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir.1993); *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974, 976 (1985); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598–99 (1959). Con Edison asserts that the sole exception to this rule is for contracts containing a disclaimer addressing the specific representation at issue in the case. *See, e.g., Danann*, 184 N.Y.S.2d 599, 157 N.E.2d at 599.

In this case, the specific disclaimer in the Confidentiality Agreement combined with the merger clause in the Merger Agreement defeat any claim of reasonable reliance on the alleged oral statements in the course of due diligence and the written August Policies. All of the oral statements were made during the course of due diligence and the August Policies were provided pursuant to the Confidentiality Agreement. The Confidentiality Agreement unambiguously provides that "Each party agrees that it is not entitled to rely on the accuracy or completeness of the Evaluation Material" supplied during due diligence. (Confid.Agr.¶ 6.) The alleged oral representations by NU employees and

---

**3.** The Court will use the title "Emergent Capital" when referring to the facts of the case as

a whole but will cite to the specific decisions in *Emergent Capital I* and *Emergent Capital II*.

the August Policies constitute such Evaluation Material. (Confid.Agr.¶ 1.)[4]

The Merger Agreement went on to provide that the Merger Agreement and the Confidentiality Agreement were the entire agreement between the parties and superseded all prior understandings, both written and oral. Con Edison, advised by sophisticated financial and legal advisors in a multi-billion dollar transaction, was specifically advised that it could not rely on the oral representations and documents provided in due diligence. If it did believe that any such statements or documents were significant, it could have made them a basis for a specific representation and warranty in the Merger Agreement but it failed to do so. Pursuant to the documents in this case, Con Edison cannot establish that it reasonably relied on the alleged oral representations or the August Policies. *See Harsco Corp. v. Segui*, 91 F.3d 337, 343–48 (2d Cir.1996); *Emergent Capital II*, 195 F.Supp.2d at 562.

This case is an even stronger case for barring any finding of reasonable reliance than *Harsco* where the Court of Appeals found no basis for claims of fraud and negligent misrepresentation brought by an acquiring company, Harsco, against various officers and directors of MultiServ, the acquiree, because reasonable reliance could not be established. The plaintiff alleged that a "no other representations" clause in the parties' merger agreement used general terms that were insufficient to bar a claim for reasonable reliance. *Harsco*, 91 F.3d 337 at 345.[5] Harsco claimed that during a 14–day confirmatory due diligence, the defendants represented that one of their manufacturing plants in Russia would be operational within approximately six months while knowing that the foundation for the plant had not even been poured. *Id.* at 346. Like this case, no specific representations about the Russian plant were included in the relevant sections of the merger agreement (§§ 2.01–2.04). Despite this fact, the Court of Appeals found that, "We think Harsco should be treated as if it meant what it said when it agreed ... that there

4. This fact distinguishes this case from *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87 (2d Cir.2001), on which Con Edison relies. In *Suez*, the Second Circuit Court of Appeals reversed the district court's dismissal of a negligent misrepresentation claim on a motion to dismiss. The Court of Appeals found, in part, that the defendants could not rely on relevant portions of a confidentiality agreement that disclaimed any reliance on the accuracy or completeness of certain information transmitted from the defendants to the plaintiffs. *Id.* at 104. However, in that case, the alleged conflicting oral statements would not have been covered by the confidentiality agreement and thus the court found that the tension between the oral statement and the agreement could not be resolved on the pleadings. *Id.* Unlike *Suez*, there is no question that the alleged representations upon which Con Edison claims to have relied were Evaluation Materials as defined by the Confidentiality Agreement. Moreover, unlike the present case, *Suez* did not involve a Confidentiality Agreement followed by a Merger Agreement with a merger clause where the parties had the opportunity to include any representations or warranties on which they purported to rely.

5. A portion of Section 2.05 of the agreement stated that the Defendants "make no representation or warranty to Harsco regarding (a) any projections, estimates or budgets heretofore delivered to or made available to Purchaser of future revenues, expenses or expenditures, future results of operations ..., future cash flows or future financial condition ... of MultiServ or the future business of MultiServ; or (b) any other information or documents made available to Harsco or its counsel, accountants or advisors with respect to MultiServ or the business and operations of MultiServ, except as expressly covered by a representation and warranty contained in Sections 2.01 through 2.04 hereof." *Harsco*, 91 F.3d 337 at 345 (internal quotation marks and alterations omitted).

were no representations other than those contained in Sections 2.01 through 2.04 that were part of the transaction." *Id.* The court concluded, "relying on the sophisticated context of this transaction, we hold that Harsco must be held to its agreement." *Id.*

As in *Harsco,* the August Policies and the alleged oral representations that NU gave Con Edison during due diligence were not mentioned by name in the Confidentiality Agreement or the Merger Agreement. But the Court of Appeals in *Harsco* found such explicit language unnecessary in part because "the exhaustive nature of the [Agreement's] representations adds to the specificity of [the Agreement's] disclaimer of other representations." *Id.* The same conclusion can be reached in this case because the Confidentiality Agreement made clear that neither party could rely on representations made in the course due diligence and the Merger Agreement provided that it and the Confidentiality Agreement were the entire agreement between the parties and superceded all other understandings. Like Harsco, the Confidentiality Agreement's disclaimer, as well as the integration clause in the Merger Agreement, are strengthened by the extensive and exclusive representations and warranties made in the Merger Agreement which failed to

include the representations on which Con Edison now seeks to rely.

Similarly, in *Emergent Capital,* in dismissing a claim of fraudulent inducement, Judge Sweet of this court pointed to the 29 separate representations and warranties, and 16 separate covenants, favoring the plaintiff that were contained in the Stock Purchase Agreement at issue. *Emergent Capital I,* 165 F.Supp.2d at 622; *see also Emergent Capital II,* 195 F.Supp.2d at 562 ("If [the] merger clause stood alone, there would be no question that it would not by itself preclude reasonable reliance as a matter of law. In addition to the merger clause, however, the Stock Purchase Agreement makes 29 separate representations and warranties and 16 separate covenants in favor of [the plaintiff].")[6] Again, similar to this case, the Stock Purchase Agreement did not include any representations or warranties specifically addressing the subject matter of the alleged fraudulent representation. Nonetheless, the court found, "Even in the absence of a specific disclaimer, a fraudulent inducement claim will be barred whenever an express provision in a written contract contradicts the claimed oral representations in a meaningful fashion." *Emergent Capital II,* 195 F.Supp.2d at 561 (internal quotation marks omitted) (collecting cases).[7] Moreover, "[e]ven if an inte-

---

**6.** The merger clause at issue read, "This Agreement, together with the exhibits and schedules hereto and ancillary Agreements, contains the entire understanding and agreement between or among [the signatories], and supersedes all prior understandings or agreements between or among any of [the signatories] with respect to the subject matter hereof." *Emergent Capital II,* 195 F.Supp.2d at 562.

**7.** Con Edison relies on *JPMorgan Chase Bank v. Liberty Mutual Ins. Co.,* 189 F.Supp.2d 24 (S.D.N.Y.2002), in which Judge Rakoff denied a motion for summary judgment on the grounds of fraudulent inducement and/or

fraudulent concealment in part because the broad disclaimer language in that case did not preclude a finding of reasonable reliance. However, the facts of this case more closely resemble those of *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985), which the court in *JPMorgan* used to distinguish the facts of that case from those in which the New York Court of Appeals found that a disclaimer agreement barred a claim of reasonable reliance. In *Plapinger,* despite broad disclaimer language, the disclaimers of reliance were signed during the same negotiations during which certain relied upon promises were allegedly made. As

gration clause is general, a fraud claim will not stand where the clause was included in a multimillion dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract." *Emergent Capital I,* 165 F.Supp.2d at 622.

Con Edison urges the Court to disregard *Emergent Capital* in view of the Second Circuit Court of Appeals' decision in *Caiola v. Citibank,* 295 F.3d 312 (2d Cir. 2002). However, *Caiola* is not inconsistent with *Emergent Capital* or *Harsco* and is distinguishable from this case.

In *Caiola,* the plaintiff brought federal securities fraud and state law claims against the defendant, Citibank, which the district court dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Caiola, a sophisticated investor and major client of Citibank, undertook high volume equity trading and entrusted funds to Citibank which in turn engaged various outside brokerage firms. *Id.* at 315. As Caiola's trades grew, Citibank proposed synthetic trading as a way for Caiola, who was heavily concentrated in large positions of a single stock, to reduce the risks associated with large-volume trading. *Id.* at 316. Caiola took Citibank's advice and the parties documented the resulting transactions through an International Swap Dealers Master Agreement ("ISDA Agreement") dated March 25, 1994, which governed the overall synthetic trading relationship. *Id.* The ISDA

Agreement contained an integration clause stating, in part, "This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto." *Id.* at 318. Each synthetic transaction was governed by an individualized Confirmation containing a number of disclaimers. *Id.* at 317. One such disclaimer provided that each party represented to the other that "it is not relying on any advice, statements or recommendations (whether written or oral) of the other party." *Id.*

In October 1998, Citibank's parent company merged with another corporation and Caiola feared that Salomon Smith Barney ("SSB"), an affiliate of that corporation, would become involved in his account. *Id.* When Citibank informed Caiola that this would in fact happen, Caiola threatened to terminate his relationship with Citibank. *Id.* In response, Citibank assured Caiola that SSB would not interfere and that his synthetic trading relationship with Citibank would remain unchanged. *Id.* Moreover, Citibank told Caiola that it would continue to control risks through delta hedging, a strategy that provides protection against small changes of an underlying asset over a short time period. *Id.* at 317, 330. Caiola allegedly relied on these assurances and continued doing business with Citibank.

Within approximately six months, Caiola discovered that Citibank had ceased treat-

---

Judge Rakoff explained, because of the proximity between the disclaimer and the alleged oral representations, "in agreeing to the disclaimers, the corporate officers had to know that, at a minimum, the disclaimers precluded reliance on any specific oral promises made during the defendants' negotiations with the [plaintiffs]." *JPMorgan,* 189 F.Supp.2d at 27. Similarly, the disclaimers in the Confidentiality Agreement in this case explicitly addressed

the information provided to Con Edison during due diligence and Con Edison must have known, in agreeing to that provision, that it was giving up the right to rely on the August Policies turned over during due diligence or any alleged oral statements made during that same period unless Con Edison chose to include specific representations and warranties in the subsequent definitive agreement that covered those alleged representations.

ing his investments synthetically as early a November 1998. *Id.* at 319. Instead, at SSB's direction, many of his trades had been executed on the physical market. *Id.* at 319. Caiola claims that he lost tens of millions of dollars in March 1999 alone because Citibank had secretly and unilaterally terminated synthetic trading. *Id.* The Court of Appeals rejected Citibank's argument that a reasonable investor of Caiola's sophistication would not have relied on the defendant's alleged oral misrepresentations in view of the disclaimers in the ISDA Agreement and Confirmation. *Id.* at 330.

The disclaimers in *Caiola* differ significantly from those contained in the Confidentiality Agreement and the Merger Agreement in this case. First, the ISDA Agreement was executed almost exactly five years before Caiola discovered that Citibank had stopped synthetic trading. Second, the ISDA Agreement governed the parties' relationship as a whole rather than the specific, relatively brief due diligence period governed by the Confidentiality Agreement in this case. Moreover, the disclaimer in the Confirmation in *Caiola* fell "well short of tracking the particular misrepresentations alleged by Caiola." *Id.* The Court of Appeals found that the Confirmation at issue in *Caiola* stated "only in general terms that neither party relies 'on any advice, statements or recommendation (whether written or oral) or the other part.'" *Id.* The disclaimer demonstrated no connection to Citibank's practice of delta hedging. In comparison, the Confidentiality Agreement in this case specifically disclaimed reliance on any Evaluation Material, which would include oral statements and the August Policies, supplied during due diligence. The Merger Agreement subsequently disclaimed reliance on any statement or information not memorialized in that document. The documents and transactions in *Caiola* are thus very different from those at issue in this case.

"In evaluating justifiable reliance, the plaintiff's sophistication and expertise is a principal consideration." *Emergent Capital I,* 165 F.Supp.2d at 623 (collecting cases). Con Edison, a sophisticated party advised by sophisticated financial and legal advisors, had ample opportunity during due diligence to obtain any necessary information about Select, and has not shown that NU ever denied access to such information. Nor has Con Edison demonstrated that it made sufficient efforts to obtain the type of information about Select and NU's risk management policies that it now claims were integral to the decision to merge with NU. *See Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1543 (2d Cir.1997) ("Where, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may be not as represented.") (quoting *Rodas v. Manitaras,* 159 A.D.2d 341, 343, 552 N.Y.S.2d 618 (1990)). *See also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 157 (2d Cir.1995) (affirming summary judgment dismissing a fraud claim when plaintiff could not prove reasonable reliance on a known and disclosed risk that was "readily available to [the plaintiff] or any interested party who cared to ask"); *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737–38 (2d Cir. 1984) (plaintiff's expertise, unfettered access to relevant information, and failure to take advantage of that access precluded plaintiff's claim of justifiable reliance on alleged misrepresentations). "Where sophisticated businessmen engaged in major

transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman*, 748 F.2d at 737.

The plaintiff could have asked NU for additional documents as it saw fit, such as underlying Select contracts, but there is no evidence that Con Edison did so or that NU failed to provide any requested material. For example, Con Edison's Charles Weliky testified as follows at his deposition:

Q: Was there anything that you asked for that you didn't get [in order to evaluate Select's position from a volume or risk management perspective]?

A: Yes.

Q: What was that?

A: The actual documents, the contracts, actual documents.

Q: Which contracts are you referring to?

A: All contracts that Select had.

Q: Who did you ask?

A: I didn't—that's the type of thing that we needed.

Q: Did anyone at Con Ed ask for that?

A: I don't know.

(Weliky Dep. at 36.) Moreover, Con Edison employee John Perkins, Director of Financial Administration for Con Edison Company of New York, testified that Con Edison never expected to review Select's actual contracts in order to determine if the company was in compliance with its risk management policies. (Deposition of John Perkins dated Feb. 1, 2002 ("Perkins Dep.") at 19–20 attached as Ex. 86 to Gueli Decl. Opp.) Perkins explained:

I mean, from my own experience, contracts of that type . . . are generally considered confidential, so it's not something that we, for example, would typically give to anybody else. . . . It's really

you have to go and ask what contracts you're engaged in, what you are covering. It's unlikely, extremely unlikely that someone would go across the confidentiality barrier and give you the contract.

(Perkins Dep. at 19–20.)

Moreover, multiple high level Con Edison employees testified that NU never denied Con Edison any requested information during due diligence. Weliky testified that no one from Select ever told him that they would not supply Con Edison with the Select contracts. (Weliky Dep. at 38.) Nor did Weliky hear from anyone at Con Edison that such a request had been refused. (*Id.*) Weliky admitted that after meeting with Simon and Frost on September 23, 1999, he did not recall ever discussing the risk management policies with anyone at Select or NU. (*Id.* at 42.)

Joan Freilich's experience appears consistent with Weliky's and she testified at her deposition as follows:

Q: During the course of the due diligence process, was there any information that you had asked for that Northeast Utilities didn't provide?

A: Some of it may have been provided in discussion or informally as opposed to formally, but I don't recall that we specifically asked for any information that was not provided at all, or that at least we didn't have an explanation that we weren't able to accept as to why it might not be provided.

Q: So do you recall that there was information that wasn't provided, but there was an acceptable explanation that went along with it?

A: I don't recall specifically, but there might have been.

(Freilich Dep. at 36–37.)

And Finally, Luther Tai, the Vice President of Corporate Planning at Con Edison,

who maintained significant control over Con Edison's due diligence at Select, (Deposition of Luther Tai dated Nov. 28, 2001 ("Tai Dep. Nov. 28") at 29–30 attached as Ex. 88 to Kraus Decl. Supp.), testified as follows:

Q: Did it ever come to your attention that NU held back from Con Ed information that it thought was competitively sensitive?

A: I don't recall specifically.

Q: Do you have even a general recollection of something like that happening?

A: No.

(Tai Dep. Nov. 28 at 61.)

Con Edison has not demonstrated that it sought the information about how the Standard Offer Contract was covered or Select's risk management policies that it now claims was crucial to its decision to merge with NU. Nor has Con Edison pointed to evidence that NU ever denied such information to Con Edison.[8] (Deposition of Joseph Cunha dated Oct. 26, 2001

at 57 attached as Ex. 59 to Kraus Decl. Supp.; Deposition of Howard Kelley dated Aug. 20, 2001 at 100 attached as Ex. 72 to Kraus Decl. Supp.)

If NU had refused to provide any information that Con Edison sought, Con Edison, a sophisticated party, could have structured the Merger Agreement to include additional representations and warranties addressing any reservations Con Edison maintained over risk management polices at Select or, for that matter, any other relevant concerns. Instead, Con Edison chose to enter into an agreement without including such language or specifically including any representations or warranties with respect to the August Policies or alleged oral representations made during due diligence, both of which were disclaimed by the Confidentiality and Merger Agreements. "Sophisticated parties to major transactions cannot avoid their disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or

---

8. In spite of the testimony cited above, Con Edison contends that, "Because of confidentiality concerns, concerns about sharing potentially sensitive information, and concerns about potential leaks, NU limited the documents it would directly provide to Con Edison, and insisted that Con Edison's diligence respecting Select rely on discussions with and presentations by senior representatives of NU, such as John Forsgren and Gary Simon, to obtain the requested information." (Pl.'s Resp. Rule 56.1 St. ¶ 9.) However, the deposition testimony that Con Edison cites in support of this contention fails to identify any specific instances in which Con Edison actually requested specific information or documents and had that request denied due to confidentiality or other concerns. (Deposition of John D. McMahon dated Nov. 21, 2001 at 27–30 attached as Ex. 83 to Gueli Decl. Opp.; Freilich Dep. Gueli at 33–34, 64–66, 126–28; Weliky Dep. 36–38, 67–71, 129–30; Frost Dep. at 35–36, 81; Deposition of Nicholas Galletti dated Nov. 15, 2001 ("Galletti Dep.") at 88, 101–02, 106–07 attached as

Ex. 74 to Gueli Decl. Opp.) There is limited deposition testimony cited by the plaintiff that alludes somewhat more clearly to information that NU did not provide. (Weliky Dep. at 88–89, 135–36; Frost Dep. at 136–37; Galletti Dep. at 195–96.) Even this testimony falls short of evidence that Con Edison asked for specific documents that NU refused to provide, particularly in view of the deposition testimony from Con Edison's own witnesses cited in the text. In any event, it would have been unreasonable in a multi-billion dollar transaction to have relied on oral representations about contracts that were not produced, particularly in the face of a Confidentiality Agreement that said no reliance could be placed on such representations and when no representations about the allegedly withheld contracts were included in the Merger Agreement. If the plaintiff was in fact concerned about its inability to view any contracts, this is exactly the type of concern that it could have hedged against by including a pertinent representation or warranty in the Merger Agreement.

more complete warranties." *DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 322 (S.D.N.Y.2002). "It is not the role of the courts to relieve sophisticated parties from detailed, bargained-for contractual provisions that allocate risks between them, and to provide extra-contractual rights or obligations for one side or the other." *Id.*

Ultimately, Con Edison's claim that the disclaimers in the Confidentiality and Merger Agreements are too general to bar reasonable reliance is unpersuasive. The Confidentiality Agreement explicitly disclaimed reliance on the exact type of due diligence representations made in the August Policies and allegedly made orally by NU employees. The parties subsequently agreed to an integration clause in the Merger Agreement that barred reliance on any representations or information that was not specifically covered by the extensive and detailed representations, warranties and covenants in that contract. The Confidentiality Agreement facilitated the production of documents and information subject to the condition that such materials could not be relied upon unless they were specifically included in the subsequent definitive agreement. Considering the combined force of these two documents, no reasonable jury could conclude that Con Edison reasonably relied on the alleged misrepresentations. The sophistication of the parties, the arms-length nature of the transaction, and the inclusion of numerous representations and warranties covering other aspects of the merger all support this conclusion.

Because Con Edison cannot sustain a claim of reasonable reliance, NU's motion for summary judgment on Con Edison's fraudulent inducement claim is granted. Count VI of the Complaint is therefore dismissed.

Con Edison also seeks summary judgment on its claim that NU fraudulently induced Con Edison into entering into the Merger Agreement by misrepresenting Select's risk management policy. For the reasons already explained, Con Edison cannot demonstrate reasonable reliance to succeed on this claim. Therefore, Con Edison's motion for summary judgment on Count VI is denied.

## IV.

NU seeks summary judgment dismissing Con Edison's Seventh Claim for Relief for negligent misrepresentation. Con Ed alleges that:

> NU negligently misrepresented to Con Edison that Select was or would be matched on, or otherwise would employ appropriate risk management techniques with respect to, its fixed-price contractual supply obligations to CL & P and adhered to defined risk management policies that precluded Select from maintaining more than a specified limited number of megawatt hours in unmatched fixed-price contractual supply commitments in any given year.

(Compl.¶ 83.) Con Edison contends that it factually and reasonably relied on those representations to its detriment in deciding to enter into the Merger Agreement and seeks declaratory judgment that the Merger Agreement is void or voidable, as well as money damages. (Compl.¶¶ 84–86.)

■■ The elements of a claim for negligent misrepresentation under New York law are that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied

on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000). Thus, to prove negligent misrepresentation under New York law the plaintiff must prove reasonable reliance on the alleged misrepresentation. For the reasons explained in Part III, Con Edison cannot demonstrate the necessary element of reasonable reliance. NU's motion for summary judgment on Con Edison's negligent misrepresentation claim is therefore granted.

■ NU also alleges that Con Edison's negligent misrepresentation should be dismissed because there is no special relationship between the parties. Under New York law, a claim for negligent misrepresentation is not actionable without a special relationship of trust or confidence. *See Suez,* 250 F.3d at 102–03; *Banque Arabe,* 57 F.3d at 158; *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 531–32 (S.D.N.Y.1996). The determination of whether a special relationship existed is a factual inquiry. *Suez,* 250 F.3d at 103.

The Complaint alleges that "there existed between the parties a close degree of trust and reliance in connection with the due diligence process." (Compl.¶ 83.) Con Edison contends that NU violated this relationship by failing to provide correct information about Select, failing to make full, complete and accurate disclosures, and by remaining silent about Select's risk management policies despite a duty to speak that resulted from NU's superior knowledge of Select. NU argues, by contrast, that the parties were both sophisticated investors engaged in an arms' length transaction that did not give rise to a special relationship. *See Village on Canon,* 920 F.Supp. at 531; *Cf. Suez,* 250 F.3d at 103–04.

In this case, it is unnecessary to reach the question of whether a special relationship existed between the parties because Con Edison cannot prove the essential element of reasonable reliance, and therefore Con Edison cannot prevail on its Seventh Claim for Relief. NU's motion for summary judgment dismissing Con Edison's negligent misrepresentation claim is therefore granted.

V.

■ Both parties move for summary judgment on Con Edison's First and Third Claims for Relief. The first count alleges that "Northeast has breached or failed to perform in a material respect its obligations under Section 4.01 of the Agreement." (Compl.¶ 52.) Con Edison seeks monetary damages on this claim. (Compl.¶ 55.) The third claim alleges the failure of a condition precedent under Section 6.02(a) of the Merger Agreement which provides that it is a condition of Con Edison's obligations that the "representations and warranties of NU set forth herein shall be true and correct both when made and at and as of the Closing Date...." (Merger Agr. § 6.02(a).) The third claim alleges "Northeast has failed to perform or caused to be performed in all material respects all obligations required to be performed by it and its subsidiaries under Section 4.01 of the Agreement." (Compl.¶ 62.) "By reason of the foregoing, there has been a failure of a condition precedent to Con Edison's obligation to proceed with and consummate the mergers contemplated by the Agreement." (Compl.¶ 64.) Con Edison seeks equitable relief on this claim. (Compl.¶ 65.)

Section 4.01 of the Merger Agreement provides that between the execution of the Merger Agreement on October 13, 1999 and the closing of the merger, "NU shall, and shall cause the NU Subsidiaries to, carry on their respective businesses in the ordinary course consistent with past practice...." (Merger Agr. § 4.01.) Con Edi-

son claims that NU's failure to do so constitutes a breach of the Merger Agreement and a failure of a condition precedent under Section 6.02. Thus, Con Edison argues, it may justifiably terminate the merger under Section 7.01(c) of the Merger Agreement.

Con Edison alleges, more specifically, that Select administered the CL & P Standard Offer Contract in violation of its past practices as set forth in the August Policies by failing to secure electricity supply for the duration of the contract.[9] Moreover, in further violation of Section 4.01, Select then adopted a new risk management policy on May 4, 2000, without informing Con Edison. (Select Energy Policies dated May 4, 2000 ("May Policies") attached as Ex. 20 to Gueli Decl. Supp.) Con Edison contends that the May Policies deleted key volumetric and VaR limits and that these changes allowed Select to carry large uncovered positions that vastly exceeded anything that would have been allowed under the disclosed Policy.

NU opposes Con Edison's motion and moves for summary judgment on the claims on the ground that NU's actions were in fact consistent with past practice. NU asserts that it did not adopt new policies in May 1999, but that the new document merely reflected modifications to the August Policies. Such changes were *consistent* with Select's risk management strategy because both the new and old policies state at the outset that "[t]hese Policies will be reviewed at regular intervals and changes will be approved by the Risk Oversight Council (ROC)." (August Policies at 2; May Policies at 2.) Thus, NU claims, it was fully consistent with past practice for Select to modify its risk management policies in accordance with changing business needs.

Moreover, NU argues, Select's short position was not inconsistent with past practice. The extent of Select's experience with standard offer contracts consisted of managing one requirements contract with Boston Edison beginning in 1998. As Con Edison knew, this contract had in fact proved "quite negative" for NU because Select was short electricity at a time when prices experienced an upward spike, resulting in a loss of over $20 million on the contract in the first half of 1999. (Freilich Dep. at 40; Deposition of John Forsgren dated Dec. 13, 2001 ("Forsgren Dep. Kraus") at 30–33 attached as Ex. 62 to Kraus. Decl. Supp.) Hence, NU's limited experience with standard offer contracts included the maintenance of short positions.

NU also alleges that Con Edison knew of NU's short position yet never protested prior to trying to renegotiate the Merger Agreement. For example, NU's Form 10–Q public filing with the SEC dated March 30, 2000 and filed May 15, 2000, stated:

> The servicing of CL & P's standard offer load is a significant risk for Select Energy, as this contract is for a 4–year period at a fixed price. This risk is somewhat mitigated by Select Energy

---

9. The August Policies provided, in part, that "[t]he approved hedge ratio is 70–100% for NU's future energy commodities associated with fixed price energy commitments, integrated over the life of the portfolio. Additionally, in no year can more than one million MWh of fixed price energy commitments remain unhedged." (August Policies at 5.) The August Policies set forth volumetric limits regarding specific types of energy products and

obligations in particular markets. (August Policies at 6–8.) They also provided that Select's risk exposure would be limited to a value at risk ("VaR") of no more than $20 million. (August Policies at 9.) However, the Policies also stated that *"[t]hese Policies will be reviewed at regular intervals and changes will be approved by the Risk Oversight Council (ROC)."* (August Policies at 2 (emphasis added).)

entering into purchase contracts with other energy providers to supply a portion of the standard offer requirement. If Select Energy is unable to source this load requirement at prices below the standard offer contract price as a result of energy price increases, Select Energy's earnings would be impacted by these market fluctuations.

(NU Form 10–Q for Quarterly Period Ending March 31, 2000 at 15–16 attached as Ex. 21 to Gueli Decl. Supp.) NU claims that Con Edison must have been aware of the risks facing Select.

 Based on competing interpretations of the Merger Agreement, both parties ask the Court to resolve the question of whether Select failed to follow its past practice, potentially excusing Con Edison from performance. "Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, then the interpretation of the contract becomes a question of fact" and cannot be resolved on a motion for summary judgment. *Bourne v. Walt Disney Co.,* 68 F.3d 621, 629 (2d Cir.1995)(internal alterations and quotation marks omitted); *see also Bank of America Nat'l Trust and Savings Assoc. v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985) ("Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact. Summary Judgment is therefore inappropriate.") The Court cannot determine as a matter of law that the contract is unambiguous. *See Bourne,* 68 F.3d at 629 ("If the language of the contract is 'unambiguous and conveys a definite meaning,' then the interpretation of the contract is a question of law for the court.") (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt.*

*Pension Plan,* 7 F.3d 1091, 1094 (2d Cir. 1993)).

The Court cannot determine as a matter of law whether a violation of Section 4.01 of the Merger Agreement did or did not occur. Questions of fact remain for a jury. As a result, the parties' cross-motions for summary judgment on the first and third claims are both denied.

## VI.

 Con Edison moves for summary judgment on its Fifth Cause of Action alleging that there was a failure of a condition precedent to Con Edison's obligations pursuant to Section 6.02(d) of the Merger Agreement. Section 6.02(d) provides that "[f]rom and after the date of this Agreement, no Material Adverse Change with respect to NU (including the discovery of, any deterioration in, or any worsening of, any change, effect, event, occurrence or state of facts existing or known as of the date of the Agreement) shall have occurred." A Material Adverse Change ("MAC") is "any change, effect, event, occurrence or state of facts ... that is, or would reasonably be expected to be, materially adverse to the business, assets, properties, condition (financial or otherwise), results of operations or prospects of [NU] and its subsidiaries taken as a whole...." (Merger Agr. § 8.03(b).) Con Edison alleges that the MAC constitutes a failed condition precedent under Section 6.02(d) of the Merger Agreement and excuses Con Edison from performance.

Con Edison argues that Morgan Stanley's February 27, 2001 presentation to NU's Board of Trustees demonstrated that NU suffered a MAC, particularly that portion of the MAC definition that refers to NU's "prospects." [10] (MS Feb. Presenta-

---

10. Con Edison claims to have relied on the opinions of Morgan Stanley, NU's own bank-

ers, in making this motion in order to avoid a factual dispute over the accuracy of the analy-

tion.) According to Con Edison, Morgan Stanley represented that NU's consolidated forecasted earnings for the five year period from 2001 through 2005 fell from $1.458 billion to $1.094 billion between October 1999 and September 2000. (MS Feb. Presentation at 3.) Morgan Stanley also allegedly dropped NU's per share valuation range from $18.25–$23.50 to $15.25–$18.50 between its October 1999 and February 2001 presentations to NU's Board. (MS Oct. Presentation at NU 235246; MS Feb. Presentation at MS 2273.) Con Edison also cites a report by NU Treasurer David McHale in which he noted "that between October 1999 and September 2000, Select lowered their average profit margins substantially, from 8.1% to 4.5%." (Report by David McHale to John Forsgren dated Jan. 6, 2001 at NU–182459 attached as Ex. 35 to Gueli Decl. Supp.) Taken together, Con Edison claims, the evidence demonstrates a drastic decline in NU's financial condition and prospects. In other words, the company had undergone a material adverse change.

NU denies suffering a MAC and argues that such a determination presents quintessential issues of fact for a jury to decide. Demonstrating that questions of fact remain, Dan More, the Managing Director of Mergers and Acquisitions at Morgan Stanley who actually gave the February 2001 presentation to NU's Board, offered a different view of the presentation's meaning. (Deposition of Dan More dated Nov. 30, 2001 ("More Dep.") at 6 attached as Ex. 135 to Kraus Decl. Opp.) More attested that when asked by NU management, the NU Board of Trustees, and in conversations with SSB personnel, More was "emphatic that there was no material adverse change [at NU]." (More Dep. at 69.)

sis of Con Edison's bankers, SSB. Nevertheless, genuine questions of material fact still

NU also offers a report by its own expert witness, Donna M. Hitscherich ("Hitscherich"), Adjunct Professor in the Finance and Economics Department at Columbia University's Graduate School of Business, concerning the meaning and effect of Morgan Stanley's February presentation. (Rebuttal Report of Donna M. Hitscherich dated Mar. 18, 2002 ("Hitscherich Rebuttal") attached as Ex. 146 to Kraus Decl. Supp.) NU asked Hitscherich to respond to the assertion of Con Edison's expert that:

> Analyses prepared by Morgan Stanley, NU's own financial advisor, and presented to NU's board of trustees support the conclusion that NU's prospects changed substantially and materially from October 1999 to early 2001 and that a reasonable acquirer would consider the changes in the level and mix of NU's projected profits, as reflected in Morgan Stanley's February 2001 analysis to be a significant development. From a business and economic perspective, a change of this magnitude would constitute a material adverse change in the prospects of the acquiree.

(Hitscherich Rebuttal at 1–2 (internal alterations and quotation marks omitted).) Hitscherich found the contention that changes in NU's earning forecasts between October 1999 and early 2001 constitute a MAC to be "superficial and unsupportable" and that "no proper or meaningful analysis of NU's business prospects can be based on the mere mathematical differences in the numbers contained in the [Morgan Stanley] Presentation, and ... no reasonable acquirer would view those numbers in such a summary manner" as Con Edison's expert exist.

had done. (Hitscherich Rebuttal at 3, 19–20.)

NU also challenges Con Edison's conclusions about NU's comparative financial prospects discussed above because John Forsgren allegedly explained to Joan Freilich that the information in the October 1999 forecast was "aspirational, optimistic and certainly should not be relied on." (Forsgren Decl. ¶ 5.) Forsgren also explained that Con Edison cannot make a valid comparison between the October 1999 forecast and Morgan Stanley's February 2001 presentation because the latter document was "prepared outside of the customary process by which NU compiles its official 5–year earnings projections" and was "created only for the limited purpose of deciding whether Select should make a $480 million investment" in certain other assets. (Forsgren Decl. ¶ 10.) Finally, NU notes that the price of NU's common stock as traded on the New York Stock Exchange was in fact slightly higher after Con Edison announced its withdrawal from the Merger Agreement than it was before rumors of the merger could affect NU's stock price. (Rebuttal Report of Gregg A. Jarrell dated Mar. 20, 2002 ¶¶ 10–12 attached as Ex. 93 to Kraus Decl. Supp.) Accordingly, no MAC was reflected in the trading price of NU's stock.

The parties present differing interpretations of NU's evolving financial condition and prospects. Each party has presented expert reports, deposition testimony from those involved in the merger, and various other documents purporting to support their case. The differing interpretations of the financial data and the competing testimony of the parties' experts create genuine issues of material fact that cannot be resolved on this motion for summary judgment. Therefore, Con Edison's motion for summary judgment on the Fifth Cause of Action is denied.

## VII.

Con Edison moves for summary judgment dismissing NU's counterclaim which alleges that Con Edison materially breached the Merger Agreement by repudiating its obligations under the contract and by refusing to proceed with the merger on the terms set forth in the Merger Agreement. (Counterclaim ¶ 60.) NU contends that the material breach occurred on or about March 5, 2001 when Con Edison notified NU that it would not proceed with the merger on the terms set forth in the Merger Agreement. (Counterclaim ¶ 7.) This breach allegedly caused NU and its shareholders substantial damages, including but not limited to the loss of the acquisition premium in the Merger Agreement; the difference between the merger consideration as established by the Merger Agreement and the current market value of NU's common stock; the expenditure of NU's time, money, and other resources in seeking regulatory approval of the merger and in preparing for consolidation of NU and Con Edison after consummation of the merger; and lost business opportunities during the time that NU's operations were restricted by provisions of the Merger Agreement. (Counterclaim ¶ 61.)

According to Con Edison, NU cannot obtain consequential damages for any alleged breach of contract because the Merger Agreement requires that such recovery be preceded by a "willful" breach which Con Edison claims did not occur. Section 7.02 of the Merger Agreement provides that in the event of termination of the Agreement by either party "as provided in Section 7.01," the Merger Agreement "shall forthwith become null and void and have no effect, without any liability or obligation on the part of [either party] [other than pursuant to certain sections

not here relevant] ...." Consequential damages are only available:

> to the extent that such termination results from the *willful and material breach* by a party of any of its representations, warranties, covenants or agreements set forth in this Agreement, in which case such termination shall not relieve any party of any liability or damages resulting from its willful and material breach of this Agreement....

(Merger Agr. § 7.02 (emphasis added).) Con Edison argues that the sole way in which NU can obtain consequential damages for breach of contract is by satisfying the conditions of Section 7.

Con Edison defines "willful" breach as conduct undertaken with malice and in bad faith in accordance with the New York Court of Appeals decision in *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 618 N.Y.S.2d 882, 643 N.E.2d 504 (1994). At issue in *Metropolitan Life* was a contractual provision limiting liability for actions other than those involving "intentional misrepresentations, or damages arising out of [defendant's] willful acts or gross negligence." *Id.* 618 N.Y.S.2d 882, 643 N.E.2d at 506 (emphasis omitted) (alteration in the original). *See also Kalisch–Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413, 416–17 (1983) (finding an exculpatory clause unenforceable when the misconduct for which it granted immunity was "fraudulent, malicious or prompted by the sinister intention of one acting in bad faith.")

Con Edison contends that NU can point to no evidence of willful conduct or bad faith by Con Edison. Instead, Con Edison claims, it failed to go through with the merger due to the type of economic self-interest that *Metropolitan Life* held not to be willful. In support of this claim, Con Edison cites statements by two NU executives who testified that they thought Con Edison refused to go forward with the merger because of genuine financial concerns, and that Con Edison CEO McGrath acted in good faith in negotiating the merger. (Deposition of John Forsgren dated Dec. 13, 2001 ("Forsgren Dep. Gueli") at 330 attached as Ex. 59 to Gueli Decl. Supp.; Deposition of Michael G. Morris dated Dec. 20, 2001 at 219 attached as Ex. 74 to Gueli Decl. Supp.) At oral argument, counsel for NU characterized these statements as made without the benefit of full discovery and in accordance with deponents' desires to avoid accusing Con Edison of bad acts. (Tr. at 60.) Counsel also argued that the meaning of such statements should properly be fleshed out on cross examination at trial. (Tr. at 60.)

NU argues correctly that the definition of willful acts in *Metropolitan Life* is of little use in determining what constitutes a "willful and material breach" under Section 7.02 of the Merger Agreement. In *Metropolitan Life*, the New York Court of Appeals concluded that "the term willful acts *as used in this contract* was intended by the parties to subsume conduct which is tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties." *Metropolitan Life*, 618 N.Y.S.2d 882, 643 N.E.2d at 508 (emphasis added). The Court of Appeals examined the entire contract in that case and concluded that the parties "intended to narrowly exclude from protection truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial interest." *Id.* Under the contractual interpretation tool of "ejusdem generis", the court found that "willful acts" as used by the parties to the contract should be interpreted as "referring to conduct similar in nature to the

'intentional misrepresentation' and 'gross negligence' with which it was joined as exceptions to defendant's general immunity from liability for consequential damages." *Id.*

There is no evidence that the parties in this case intended a definition based on tort law to apply to Section 7.02 of the Merger Agreement. *See VTech Holdings Ltd. v. Lucent Technologies Inc.*, 172 F.Supp.2d 435, 441–42 (S.D.N.Y.2001). In this case willfulness is tied only to a material breach of the contract and not to tort concepts such as "intentional misrepresentation" and "gross negligence." The terms of the Merger Agreement are not so unambiguous that the Court can determine that Con Edison's interpretation is correct as a matter of law or that Con Edison's actions do not rise to the level of willfulness required to recover consequential damages.

NU also argues that Section 7.02 simply does not govern its breach of contract claim and therefore it need not prove a willful breach to recover consequential damages. Section 7 of the Merger Agreement is a termination clause rather than a general provision for breach of contract damages, and applies "[i]n the event of termination of this Agreement by either NU or [Con Edison] as provided in Section 7.01." (Merger Agr. § 7.02.) Section 7.01 provides the conditions under which the Merger Agreement can be terminated. The actual procedures for termination are outlined in Section 7.05, which states that termination pursuant to Section 7.01:

> shall, in order to be effective, require, in the case of NU, action by its Board of Trustees or the duly authorized committee or designee of its Board of Trustees to the extent permitted by law and the Trust Agreement and, in the case of [Con Edison], action by its Board of Directors or the duly authorized com-

mittee or designee of its Board of Directors to the extent permitted by law and its certificate of incorporation.

(Merger Agr. § 7.01.) NU argues that neither NU's Board of Trustees nor Con Edison's Board of Directors took any "action" to terminate the Merger Agreement and thus Section 7.02 does not apply to the Counterclaim. (*See, e.g.,* Deposition of Michael J. Delguidice dated July 16, 2001 at 212–14 attached as Ex. 61 to Kraus. Decl. Supp.; Deposition of Joan Freilich dated Dec. 11, 2001 at 436 attached as Ex. 63 to Kraus Decl. Supp.; Deposition of Ellen V. Futter dated Nov. 9, 2001 at 97–98, 213 attached as Ex. 66 to Kraus. Decl. Supp.)

Con Edison attacks this assertion on two primary grounds. First, Con Edison argues that NU has defeated its claim for consequential damages by alleging that neither party terminated the Merger Agreement. Con Edison contends that such damages are available only if there is both a breach and a subsequent termination, which counsel for Con Edison stated would occur after a breach. (Tr. at 8.) It is true that the Merger Agreement contains no provision for relief in the event of a breach of contract without a valid termination. And it is possible that the parties intended Section 7's termination provisions to provide the exclusive coverage of the parties' liabilities in case of a breach.

Second, Con Edison argues that it did in fact terminate the Merger Agreement when McGrath informed Morris on March 5, 2001 that Con Edison would not proceed with the merger. Con Edison contends that NU conceded the fact of Con Edison's termination when Morris wrote to McGrath that same day that "Con Edison's unwillingness to proceed effectively terminates our Merger Agreement." (Letter from Morris to McGrath dated Mar. 5, 2001 ("Morris–McGrath Letter") attached as Ex. 41 to Gueli Decl. Supp.) The letter

also stated: "NU considers Con Edison's refusal to proceed with the merger at the agreed-upon price to constitute an anticipatory repudiation and breach of our Merger Agreement." (Morris–McGrath Letter.) As further evidence of termination, Con Edison cites an NU press release which stated that because Con Edison failed to provide assurances that it would abide by the terms of the Merger Agreement, "the agreement has effectively been terminated." (NU News Release dated Mar. 5, 2001 attached as Ex. 43 to Gueli Decl. Supp.) At oral argument, NU alleged that the uses of "terminates" and "terminated" in the above instances were merely colloquial and were not meant as contractual terms of art. (Tr. at 58.)

There are issues of fact as to the interpretation of Section 7 of the Merger Agreement. It is not clear that Section 7, which provided for a regularized method of termination of the Merger Agreement, provided the sole basis for a party to obtain damages if the other party breached the Merger Agreement by failing to abide by its terms. NU's argument is that Con Edison breached the Merger Agreement by failing to proceed with the merger in accordance with the terms of the Merger Agreement. There are also disputed issues whether the termination provision was substantially complied with. In any event, even if Section 7 were the exclusive means to obtain consequential damages, there would be issues of fact as to the intent of the parties in requiring a "willful and material breach" and whether such an event had occurred. Therefore, Con Edison's motion to dismiss NU's Counterclaim for breach of contract is denied.

## VIII.

■ Con Edison also moves for summary judgment dismissing NU's counterclaim for lack of standing to the extent that NU seeks to recover its shareholders' lost premium. Paragraph 61 of the counterclaim alleges, in part, "As a result of Con Ed's breach of the Merger Agreement, *NU and its thousands of public shareholders* have suffered substantial damages, including but not limited to the loss of the acquisition premium in the Merger Agreement...." (Counterclaim ¶ 61 (emphasis added).) The parties agree that NU could recover the takeover premium on behalf of its shareholders if they are intended third party beneficiaries of the Merger Agreement. However, Con Edison and NU disagree about whether this is the case.

According to Con Edison, Section 8.06 of the Merger Agreement makes explicit that there are no intended third party beneficiaries of the contract. Section 8.06 provides that "except for the provisions of Article II ... [the Merger Agreement is] not intended to confer upon any person other than the parties any rights or remedies." (Merger Agr. § 8.06.) Article II of the Merger Agreement outlines what would happen when Con Edison and NU merge (the "Effective Time"), including provisions for Con Edison to pay the merger consideration to NU shareholders. (Merger Agr. Art. 2.)

■ NU can sue on behalf of its shareholders if they are intended third party beneficiaries of the Merger Agreement. *See Associated Teachers of Huntington, Inc. v. Bd. of Educ.*, 33 N.Y.2d 229, 351 N.Y.S.2d 670, 306 N.E.2d 791, 794 (1973) ("the promisee has an undisputed right to enforce the contract made for the benefit of third parties"). Under New York law, NU's shareholders are intended (rather than incidental) beneficiaries of the Merger Agreement "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance

of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. . . ." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir.2002) (quoting Restatement (Second) Contracts § 302). "An incidental beneficiary . . . is not an intended beneficiary." *LaSalle Nat'l Bank v. Ernst & Young LLP*, 285 A.D.2d 101, 729 N.Y.S.2d 671, 676 (2001). While the Merger Agreement negatived the existence of third party beneficiaries, it explicitly excepted Article II, thus creating third party beneficiaries in accordance with Article II. By its terms, the Merger Agreement thus explicitly made NU's shareholders third party beneficiaries of Con Edison's promise to pay the merger consideration.

Con Edison would limit third party beneficiary rights for the shareholders solely to the time after the merger had been completed, NU had ceased to exist, and the former NU shareholders were the only parties who could sue if they were not paid the merger consideration. However, there is no such limitation in the Merger Agreement. NU argues that the provision is in fact a common provision which is added to agreements precisely to permit a corporation to sue for damages when a merger has not been completed and where the bulk of damages will be the damages the shareholders suffered because the merger was not completed. (Tr. at 67–68.) There

is no question under the Merger Agreement that the NU shareholders were third party beneficiaries and there is no basis in the Merger Agreement to limit their third party beneficiary status solely to the time after the merger had been completed.[11]

■ Con Edison makes an independent argument that NU cannot recover damages on behalf of its shareholders because the shareholders released Con Edison from any and all claims relating to the merger in *Brody v. Cleveland,* No. 00 Civ. 2400 (S.D.N.Y. filed Mar. 29, 2000).[12] (Class Action Complaint filed Mar. 29, 2000 (*Brody* Complaint) attached as Ex. 52 to Gueli Decl. Supp.) *Brody* was a class action suit brought by NU shareholders against Con Edison, NU, and others for alleged violations of the federal proxy rules based on disclosures in the Proxy Statement issued by Con Edison and NU, as well as a claim against NU's trustees for breach of fiduciary duty. (*Brody* Complaint.) *Brody* terminated in a settlement agreement between the parties. (Order of Final Approval of Settlement and Final Judgment, and Order of Dismissal filed July 13, 2001 ("*Brody* Settlement") attached as Ex. 53 to Gueli Decl. Supp.) The plaintiffs (defined for purposes of the class as NU shareholders who were eligible to vote at an April 14, 2000 special shareholders meeting) agreed to release the "Released Claims," defined by the parties in a draft settlement agreement in January 2001 as:

---

**11.** NU argues that provisions such as this were drafted to allow corporations to sue for the merger consideration for their shareholders after it was found that, without such a provision, shareholders were not third party beneficiaries. *See In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F.Supp. 712, 733 (S.D.N.Y.1989); *Cities Serv. Co. v. Gulf Oil Corp.,* 797 P.2d 1009, 1011–12 (Okla.App. 1990). As NU points out, the Effective Time never materialized because the merger was never completed. Where NU alleges that Con

Edison unilaterally and unlawfully breached the Merger Agreement, Con Edison cannot avoid responsibilities that it may have to NU's shareholders relying on the argument that the Effective Time has not come to pass. *See In re Enron Corp.* No. 02 Civ. 4159 (AKH), 2002 WL 31374717, at *5 (S.D.N.Y. Oct.22, 2002).

**12.** The Honorable Denny Chin presided over *Brody v. Cleveland.*

the allegations, claims and causes of action that have been asserted against the Released Persons in the [*Brody* litigation], as well as all claims that might have been or might be asserted that arise or potentially arise out of or relate in any way to the Merger Agreement, the merger of Con Edison and Northeast, the Initial Proxy and/or any of the transactions described in the Initial Proxy, other than those claims [for breach of fiduciary duty] asserted in Count II of the [*Brody* ] Complaint.

(Declaration of Thomas J. Groark, Jr. sworn June 5, 2002 ("Groark Decl.") ¶ 10.) The *Brody* settlement also dismissed "all claims that might have been or might be asserted that arise or potentially arise out of or relate in any way to the Merger Agreement, the merger of Con Edison and Northeast, the Initial Proxy and/or any of the transactions described in the Initial Proxy...." (*Brody* Settlement ¶ 6.) The settlement provided that NU and Con Edison would mail their shareholders a supplement to their earlier Joint Proxy making certain additional disclosures. The plaintiffs received no monetary compensation from the settlement although Con Edison agreed to pay $600,000 for the class' attorneys' fees. (Groark Decl. ¶ 11.) [13]

The settlement agreement was embodied in a Stipulation and Order dated April 5, 2000 which was endorsed by Judge Chin on April 11, 2000. (Groark Decl. ¶ 6.) When the parties reached their settlement, Con Edison had not advised NU that it would not proceed with the merger, an event that only occurred in March 2001. The parties negotiated over the amount of the attorney's fees to be paid and reported to Judge Chin in November 2000 that they had fully resolved all issues among them.

(Groark Decl. ¶ 9.) The ultimate settlement was approved on July 13, 2001 and Judgment was entered.

 A release is a type of contract and is governed by principles of contract law. *Golden Pacific Bancorp v. Federal Deposit Ins. Corp.*, 273 F.3d 509, 514 (2d Cir.2001) (internal quotation marks omitted). In determining the scope and validity of a release, courts should apply state law. *See Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir.1993); *Prunella v. Carlshire Tenants, Inc.*, 94 F.Supp.2d 512, 517 (S.D.N.Y.2000). Under New York law, courts must "discern the intent of the parties to the extent their intent is evidenced by their written agreement." *Olin Corp.*, 5 F.3d at 15 (internal quotation marks omitted); *see also Golden Pacific*, 273 F.3d at 515. "Whether a contract is ambiguous is a question for the court. The interpretation of an unambiguous contract—including a release—is also a question of law for the court. Where the contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact." *Golden Pacific*, 273 F.3d at 514–15 (internal quotation marks omitted). Moreover, a release that absolves one party from liability receives the "closest of judicial scrutiny." *Id.* at 515 (quoting *Abramowitz v. N.Y. Univ. Dental Ctr., Coll. of Dentistry*, 110 A.D.2d 343, 345, 494 N.Y.S.2d 721 (N.Y.App.Div. 1985)).

NU argues that the Counterclaim does not constitute a Released Claim from *Brody* because the Released Claims related to alleged illegalities in the Joint Proxy. In other words, while the settlement agreement released Con Edison from responsibility for injuries arising from the alleged-

---

**13.** The court dismissed Count II of the Complaint alleging breach of fiduciary duty as moot by Order filed March 30, 2001.

ly faulty Joint Proxy, the *Brody* settlement did not speak to the later injuries caused by Con Edison's repudiation of the Merger Agreement. Moreover, NU claims, the parties in *Brody* could not have anticipated the counterclaim brought in this action when signing the stipulation and order dismissing the Proxy-related claims in April 2000, approximately one year before Con Edison refused to proceed with the merger. (Stipulation and Order dated Apr. 5, 2000, filed May 2, 2000 attached as Ex. 97 to Kraus Decl. Supp.)

There is no evidence that Con Edison or NU intended the *Brody* settlement to have the preclusive effect advocated by Con Edison. *Brody* addressed violations of federal securities laws regarding statements in the Joint Proxy and an alleged breach of fiduciary duties by NU's Board of Trustees. It did not concern the alleged breach of contract by Con Edison. The litigation before this Court attempts to resolves issues arising from the subsequent failed merger between Con Edison and NU. Moreover, the plaintiffs in *Brody* settled that case without receiving any monetary award for the shareholders whereas over $1 billion is at stake in the current litigation. Indeed, Con Edison's failure to raise the affirmative defense of settlement or release before proceeding through discovery, with all the accompanying costs, undercuts Con Edison's assertion that its intent in *Brody* was for the Release in that case to cover claims of the NU shareholders to the merger consideration.

If Con Edison seriously thought that its non-monetary resolution of the *Brody* litigation was disposing of the claims of the NU shareholders to the alleged hundreds of millions of dollars in damages from the failed merger, that would raise a host of additional issues. It is sufficient at this point to find that Con Edison has not shown that it is entitled to summary judg-

ment dismissing any claims by NU to the merger premium based on the *Brody* settlement.

NU also contends that Con Edison cannot rely on the *Brody* release at this stage of the litigation because Con Edison did not plead the affirmative defense in its answer. *See* Fed.R.Civ.P. 8(c); *HCC, Inc. v. R H & M Machine Co.*, 96 Civ. 4920 (PKL), 1998 WL 765176, at *1 (S.D.N.Y. Nov.2, 1998) (an affirmative defense not raised in an answer cannot form the basis for a dispositive motion). In fact, at the time that Con Edison answered the Counterclaim, on June 8, 2001, the Final Judgment in the *Brody* action had not been entered. However, Con Edison never moved to amend its Answer, nor asserted this affirmative defense to the Court in any form prior to the motion for summary judgment. At oral argument, counsel for Con Edison asked the Court to treat the motion for summary judgment as a motion for leave to amend its Answer to the counterclaim. (Tr. at 32.) *See Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 283 (2d Cir.2000) (district court has discretion to entertain defense of res judicata when raised in a motion for summary judgment by construing the motion as one to amend an answer). Con Edison never raised this argument in its papers and the application is of sufficient significance to warrant separate briefing supported by affidavits if Con Edison chooses to pursue this argument. The oral application to amend is denied without prejudice to a written motion to amend the Answer.

## IX.

NU moves for summary judgment dismissing the First and Second counts of Con Edison's Complaint which seek "compensatory, consequential and incidental damages" for breach of Sections 4.01 and

3.01(i) of the Merger Agreement. (Compl.¶¶ 52, 55, 57, 60.) In response to interrogatories asking Con Edison to quantify its damages from NU's alleged breach of the Merger Agreement, Con Edison answered:

The professional fees and expenses incurred by Con Edison in negotiating and attempting to consummate the Merger Agreement totaled at least $32.1 million. The damages suffered by Con Edison in the form of lost synergy savings equal the present value of Con Edison's approximately 82% share of (1) the expected $1,574,000,000 in synergy savings to be realized in the regulated businesses ... and (2) the expected $180,000,000 in synergy savings to be realized in the unregulated businesses. . . .

(Con Edison's Resp. to [3d] Set of Interrog. dated Jan. 22, 2002 ("Interrog.Resp.") at 2–3 attached as Ex. 7 to Kraus Decl. Supp.) [14] NU contends that Con Edison is not entitled to such damages as a matter of law.

■■ NU claims that Con Edison cannot recover purported lost synergy savings because Con Edison has not suffered any legally cognizable damages net of acquisition costs. "[W]hen computing damages for a defendant's wrongful conduct, if any benefit or opportunity for benefit appears to have accrued to the plaintiff because of the breach, a balance must be struck between the benefit and loss, and the defendant is only chargeable with the net loss." *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir.1995) (internal quotation marks omitted). Thus, "revenues due a plaintiff because of a breached contract must be offset by any amount plaintiff saved as a result of the breach." *Id.*

NU's argument is premised on the assertion that Con Edison's agreement to pay $26.50 per share would have resulted in Con Edison vastly overpaying for NU. Because the Joint Proxy identified the unaffected price of NU shares at $18.56, (Joint Proxy at 34), NU contends that Con Edison would have paid a premium of at least $7.94 per share. When multiplied by roughly 137 million shares outstanding, (Merger Agr. § 3.01(c)), the premium would have amounted to approximately $1 billion in present value terms according to NU's calculations. (Report of Gregg A. Jarell dated Feb. 8, 2002 ¶¶ 39, 88 attached as Ex. 92 to Kraus Decl. Supp.) Thus, Con Edison would have had to pay this premium before capturing any "lost synergies." Because $1 billion greatly exceeds the $707 million in net merger savings estimated by Con Edison's own expert, (Expert Report and Disclosures of Kenneth M. Lehn dated Feb. 8, 2002 ¶ 37 n.14 attached as Ex. 94 to Kraus Decl. Supp.), (only 82% of which would accrue to Con Edison, or roughly $579.7 million) NU argues that Con Edison sustained no legally cognizable damages with respect to lost synergies.

Con Edison contends that any difference between NU's actual value and the $26.50 offered merger price is a question of fact for the jury to decide. In demonstrating the issues of fact precluding summary judgment, Con Edison argues that NU's intrinsic value to the company was much higher than its unaffected trading price. Thus, Con Edison's offer constituted exactly what it thought NU was worth in combination with Con Edison rather than greatly exceeding the value of NU's stock. For example, SSB calculated a value per NU share as high as $30.25, not including synergies. (Proxy Statement at 37.) If this

---

**14.** NU refers to these Interrogatories as the Third Set of Interrogatories and Con Edison states the same in the text of its Objections and Responses. However, the document title reflects that it relates to NU's Second Set of Interrogatories.

value were taken as correct it would clearly exceed NU's unaffected trading price, as well as the merger price offered by Con Edison.

NU also claims that Con Edison cannot recover the "professional fees and expenses incurred ... in negotiating and attempting to consummate the Merger Agreement" that it seeks. (Interrog. Resp. at 3.) The parties agreed that "[e]xcept as provided in this Section 5.09, all fees and expenses incurred in connection with the Mergers, this Agreement and the transactions contemplated by this Agreement *shall be paid by the party incurring such fees and expenses,* whether or not the Mergers are consummated...." (Merger Agr. § 5.09(a) (emphasis added).) The limited exceptions to this rule require a termination of the Merger Agreement pursuant to Section 7.01. (Merger Agr. § 5.09.)

NU asserts that Con Edison never terminated the Merger Agreement and cannot recover its fees or expenses. In support of this argument and in Con Edison's opposition papers the parties reargue the points discussed in Part VII. As the Court explained above, the question of whether a termination of the Merger Agreement occurred is one for the jury and cannot be decided on a motion for summary judgment. Because the motion for summary judgment dismissing the first and second counts of the Complaint present questions of fact and contract interpretation, the motion is denied.

## X.

NU seeks summary judgment dismissing counts Two and Four of the Complaint which allege that NU breached Section 3.01(i) of the Merger Agreement, thus causing a failure of a condition precedent under Section 6.02(a). Section 3.01(i) provides that between December 31, 1998 and October 13, 1999, when the parties signed the Merger Agreement, "(i) NU and each of the NU Subsidiaries have conducted their respective businesses only in the ordinary course of business consistent with past practice and (ii) there has not been, and no fact.or condition exists which, individually or in the aggregate, would have a Material Adverse Effect on NU."

NU argues that even if Con Edison could prove that Select failed to operate in the "ordinary course of business consistent with past practice," such a violation could not have occurred between December 31, 1998 and October 13, 1999, the period covered by § 3.01(i). NU bases this assertion on the fact that Select signed the CL & P Standard Offer Contract on November 2, 1999, approximately three weeks after the date of the Merger Agreement. Furthermore, NU argues, to the extent that the second and fourth counts of the Complaint are premised on alleged MACs to NU's business or prospects, none of the events identified by Con Edison as constituting or contributing to a MAC occurred during the relevant time period. (*See* Compl. ¶¶ 42, 44–48.)

Con Edison counters NU's argument with a timeline of its own. Even though the CL & P Standard Offer Contract was not signed until November 2, 1999, Con Edison argues that Select's past practice was changed prior to October 13, 1999 by which time NU had already decided that Select would take on substantially greater risk than had been allowed previously. Con Ed claims not to have known about the policy change. To prove that the change preceded October 13, 1999, Con Edison contends that under Select's risk management policies in place on December 31, 1998, Select could not hold open positions on fixed-price energy obligations exceeding one million MWh in a given year. (NU Board of Trustees Wholesale Market-

ing Overview dated Apr. 14, 1998 at NU–29479 attached as Ex. 1 to Gueli Decl. Opp.) Thus, prior to signing the CL & P Standard Offer Contract, NU knew that doing so would violate its current risk management policy. To support this contention, Con Edison cites Select's August Position Report which noted the upcoming CL & P Standard Offer Contract and stated that Select's "energy position is substantially short to the tune of 23 million MW/hrs." (Cover Memo to August Position Report dated Sept. 30, 1999 at NU–183307 attached as Ex. 14 to Gueli Decl. Opp.) Con Edison contends that in light of the evidence, a reasonable jury could conclude that Select altered its past practice prior to October 13, 1999.

The events embodying or leading to alleged MACs cited by Con Edison raise issues of fact that cannot be decided on this motion for summary judgment. The Court cannot say as a matter of law that NU's alleged breach of Section 3.01(i) of the Merger Agreement could not have occurred, if it occurred at all, between December 31, 1998 and October 13, 1999. For this reason, the motion for summary judgment on counts Two and Four is denied.

## CONCLUSION

The remaining arguments of the parties are either moot or without merit. For the reasons explained above: (1) NU's motion for summary judgment on Con Edison's fraudulent inducement claim is granted and Count VI of the Complaint is dismissed. Con Edison's motion for summary judgment on its fraudulent inducement claim is denied. (2) NU's motion for summary judgment on Con Edison's negligent misrepresentation claim is granted and Count VII is dismissed. (3) The parties' cross-motions for summary judgment on Counts I and III are denied. (4) Con Edison's motion for summary judgment on Count V of the Complaint declaring that a MAC occurred is denied. (5) Con Edison's motion to dismiss NU's counterclaim on all asserted grounds is denied. (6) NU's motion for summary judgment dismissing Counts I, II, and IV is denied.

**SO ORDERED.**